Good morning, Your Honors. Eric Slotkin on behalf of Appellant Bernard Laborin, I'm going to attempt to reserve four minutes for rebuttal. The decision deciding Mr. Laborin of creative disability should be vacated as it is not free of legal error. The finding that there was medical improvement in pain symptoms and that there was inconsistent reporting in the effectiveness of epidural injections is not substantiated by the court of development of the record. I'd like to draw your attention to page 48 of the transcript. It's here that Mr. Laborin testified that his epidurals lasted only a few days. At page 59 of the transcript, the counsel, this is counsel, this is Judge Trotter. There's contradictory evidence on the record, is there not, where he talks about the epidurals having great effect and helping quite a lot? No, and that's the point I'm about to make, Your Honor. So, what happened there, Mr. Laborin testified it only lasted a few days, although the transcript indicates it's under questioning of the attorney, it's under questioning of the Administrative Law Judge, where she asked Mr. Laborin, and I'm reading from page 59, the question is, well, because I am looking at Exhibit 29F, and it says that your epidurals relieved your pain 45 to 60 days. Now, Exhibit 29F appears in transcript page number 700. Now, if we go to page 700, it says that facet injections provided relief for 45 to 60 days. Mr. Laborin testified as to the effectiveness of the epidural injections, not the facet injections. Epidural injections go into the spinal canal. Facet injections do not. What are facet injections? So, the spine has a bony outer rim that holds the nerves, and the facets are the outer bony portion where the nerves go through, and the epidural is the inner portion of the canal. And so, yeah, there are different techniques. Mr. Laborin went through many, many techniques. He had those epidurals, looks like 12 different times, and if you go through the record as I did, he first had an epidural in February of 2009, and that's in page 483. His next one was March 2nd of 2009, and under effectiveness of the injection, it says, quote, too early to tell. And that's at page 486. At the next one, I'm looking at the exhibit, it says he did get good relief from the facet injections. He has had multiple throughout the last few years, and they gave him well over 80% relief for 45 to 60 days. Relief is relief, isn't it? That's what he told Dr. Turley. That's what he told that physician, but the judge found, I'm going to address the relief part in a minute, but the judge said that he made an inconsistent statement regarding the effectiveness of epidurals, and he did not make that inconsistent statement. The record showed those epidurals lasting for a very, very short period of time, and he testified the epidurals lasted only a few days. He was not asked at hearing as to the effectiveness of facet injections, so he did not make any inconsistent statement. Nonetheless, that's in the record, said we ignored it. No, but what you should do is look at the broader development of that record. So, after Mr. LeGorin failed 12 epidurals, epidural injections between the period of February of 2009 and May of 2010, he had a facet injection December of 2010, February of 2011, and August of 2011, and October of 2011. While he had 45 to 60 days of some benefit, his pain always came back, and you'll see right after that last facet injection in October 2011, in January, three months later, he has an ablation procedure, and then again in January, he has another denervation procedure, and then in March, he goes on to have two more epidural injections, and so the record tells us that he may have some temporary periods of improvement, but he did a back surgery in August of 08, 12 epidurals following that, four facet injections following that, two ablation procedures following that, and I don't know if that sums up what we do with Dr. Fruitman and Dr. Cunningham. Okay, well, so, first we have to look at the reports themselves. Neither doctor reviewed these medical records. So, post-surgery, Mr. LeGorin's MRI shows that there's nerve root involvement. It's an ongoing situation. All of the physical examinations after that are showing pain. He frequently has decreased range of motion in the lumbar spine. He's got atrophy, foot drop, and sensory loss. Correct. So, if you look at 104, where they talk about the straight-leg grazing, those straight-leg graze tests are confirmed by the, not only the treating them, but they're also confirmed by the two consulting, examining physicians. In fact, let me see. If you look at Dr. Fruitman's report, I know it starts at page 556. If I had to guess, the actual finding is on 557, but it says he's got a positive straight-leg test. The straight-leg graze sign on the right. And Dr. Fruitman also finds that there's decreased sensation in an L4, L5 dermatological distribution, which is a positive finding. Dr. Fruitman knows that Mr. LeGorin walked with a limp. He had a lot of spasms and tenderness. There was slapping of his foot because he had confirmed foot drop post-surgery. So, if you look at Dr. Fruitman's report, it clearly indicates that all of those portions of 1.04 were met. In looking at Dr. Cunningham's report, I'm not sure that he comments on the straight-leg graze. I'd have to go back and look. But, interestingly enough, and I want to remind the court, Mr. LeGorin is 388 pounds with a body mass index score of somewhere between 42 and 54 during the period of time that we're talking about. He is massively obese. Dr. Cunningham knows that Mr. LeGorin is pointed, centered, like leaning forward 90 degrees and then standing. He's easily short of breath. He has complete foot drop, atrophy of the right calf, decreased sensation in an L5 distribution. He can, quote, slowly, end quote, sit to a chair and stand. He has very severe crowding of the oropharynx, which has to do with his obesity and his sleep symptoms. And, looking at Dr. Cunningham's report, he does not test the back range of motion. He only tests the cervical range of motion. He does not comment on back tenderness or pain, and he only suspects sleep apnea. I want to remind the court that Mr. LeGorin, while he was going through this process, had no income, ended up separated from his wife, ended up on food stamps, was living with no electricity and no water. He could not use his sleep apnea machine at night. And the place that he was living in, in a trailer on a commercial spot, would allow him to go into their place of business to use his machine for his asthma during the day. And so, when we look at the medical findings themselves, 1.04 is met, and the judge just writes, I find 1.00 not met or equal. There was no analysis there. So, getting back to, well, I'm going to jump to the opinion of the treating doctor. I mean, he's been involved in this case for four years. Dr. Tran's report appears to be just a checklist. Since he treated him for four years, why aren't there more medical records from Dr. Tran or more analysis from Dr. Tran? There were a lot of records from Dr. Tran. So, and I believe the commissioner says that they found only a two-year period. So, if you look, Dr. Tran is a physician at Multi-Specialty Physicians, which also is known as Internal Medicine of Surprise. It's the same facility. Most of the records in the early part, they don't list any doctor's name. Is that what it is? That's what it is. It did seem odd that the treating physician always seemed to have a medical assessment of ability to do work-related physical activities, which isn't really a diagnosis. I don't know, did Dr. Tran perform the back surgery? Dr. Tran did not perform the back surgery. A surgeon by the name of Apple, I believe, performed the surgery itself. But the records indicate that all the follow-up care was with pain management, with Dr. Turley of pain management, and then also at the same time with Dr. Tran at Multi-Specialty Physicians. Now, this is Judge Scott. What does Dr. Turley tell us about your client? Dr. Turley never gave an opinion on functional limitations in terms of what an individual, what musculoskeletal boring can do in terms of sitting, standing, walking. But if you look at Dr. Turley's records, under functional limitations, they're always listed as severe or moderately severe, indicating that there is difficulty with activities of daily living. That's the most that we can glean from those reports themselves, other than the effectiveness of the treatment and the need to repeat all of these procedures throughout the four-year course of treatment. I mean, this went on from 2008, when he had his surgery, up until 2012. And there's been no period of time where Mr. Laborde has not been receiving very aggressive care. I want to remind the Court that I'm focusing in on injections and ablations and surgery, but he's been on heavy-duty narcotics this entire period of time as well. You look at his prescriptions. They're not taking him off and prescribing a non-steroidal. They're keeping him on narcotics because his pain is severe. Yes. What did your client say? He said he didn't want an office job. That's why he didn't take one. No, not that I recall, Your Honor. My client did indicate that he received unemployment, which the Administrative Law Judge had a lot of difficulty with. But as you can tell from the record, he looked for work that would accommodate his impairments. He was looking for something that would allow him to sit and stand and walk and lie down and take breaks when needed. And he was only on that unemployment for approximately six months. So, you know, we cited Lee and Felter indicating that that's not a deterrent to entitlement to Social Security disability benefits. That's noted by the Commissioner, and they're all memorandum. It's noted in the case law. They even have a policy ruling that touches on it, although not fully relevant to what I'm talking about, where it indicates that if an ALJ expresses bias to individuals who've received unemployment, that's a conduct that they're going to look at. I am not claiming bias. That's not what happened here. No, I am not. We are not claiming bias. We're not looking at that. I just pointed that out as a point of reference to show that unemployment benefits does not mean Mr. Labore is not credible. It doesn't mean that he can't maintain a full-time work piece. It doesn't mean his pain is so severe that he would not need to rest and lie down during the day in order to relieve his pain. Is there any finding of malingering? None. Okay. You're feasible on your time. We're trying to reserve space. Okay. Thank you. Is that a positive 1.04 or a negative? Positive. Okay. Thank you. May it please the Court, my name is Brian Bach, and I'm appearing on behalf of the Commissioner. This case involves an individual with a history of treatment for lower back and right leg impairments. However, the record does not establish that these impairments or any others have rendered him disabled within the meaning of the Social Security Act. I would like to begin by briefly addressing or clarifying just a couple of points raised this morning already by the appellant. First, with respect to 1.04a, a straight leg raising test, I believe there's only one indication in the record of a positive test, and that was Dr. Fuchtman. And even that's a little unclear, because he notes pain during the test, but also even says there's not a positive Lasik sign. The Lasik sign is the straight leg raising test. But even crediting that one indication of a positive test, there are multiple other indications throughout the history, treatment history, where he does not have a positive straight leg test, including in 2009, 2010, and I believe 2011 as well. And just one other point of clarification, if you do want to give us record sites, as opposed to just sitting there here, you can do so, yes, Your Honor. I'm going to let you tell your time, and you can tell them why it's there too. There was a negative straight leg raise test, an ER 276, and that's from October 2008 from the Korn Institute, which is where he had the back surgery. There was also an ER 699, which was from December 2011, Dr. Turley at the Pain Center, and also ER 67374 from June 2012, also at the Pain Center. Thank you. And I guess while I'm on 104A, I would also mention, to satisfy that listing, you need to meet all the criteria. And he certainly can't do that, both because of the straight leg raising test, and also because of limitations of motion of the spine. There are multiple tests and medical findings that Mr. Laborde had full range of motion in his spine. Again, throughout the treatment history, including Dr. Cunningham in March 2010 at the ER 447 recess, Mr. Laborde is able to lean forward 90 degrees. And interestingly, also from Dr. Strang at his training position, there's January 2012, February 2012, and June 2012 records, all indicating full range of motion. Those sites are ER 6670, 637, and 64142. Counsel, let me interrupt you for a second. Part of the problem here is the ALJ simply said 100, 193, 104. I don't find those applicable, but there's no, there's nothing to indicate why she concluded that. And that's part of the problem. You're going through 104A, which I'm looking at, and it would have been darn nice if she would have ticked off all those prisms about the straight legs and stuff like that. I mean, it seems like you're trying to backfill for her failure in failing to address that. Haven't we said the ALJ has to explain what he or she is doing, rather than causing us to have to dig around in thousands of pages looking for stuff that might suggest that she was right? Yes, Your Honor. I believe the ALJ could have done a better job of detailing her reasoning. Isn't that enough at least for a man to say and ask her, what were you talking about? Because we can't tell. We're trying to guess now and infer from all this stuff. But, you know, you have to tell us what you're doing here, and you didn't. And then you have to go all the way over to the residual functional capacity to find all of this stuff. But that's too late in the sequential process. Your Honor, I would submit that this is grounds for remand. That the record fully supports the determination or the three findings of the ALJ. Timeout, timeout. It would have supported a different conclusion also, would it not? I don't believe so, Your Honor. I believe that all the criteria have to be met. There's no one examination showing that those criteria were all met at one time, let alone continuously for a year. And so there is no basis for a 104-A. I mean, when we look through the record, we see four years of treatment. The credibility finding is clearly incorrect. There were statements that he had 80% belief that he was talking about a different form of treatment. And finally, the third thing I have a problem with is her credibility finding that says he's not credible to the extent that it's inconsistent with her prior residual functioning capacity finding. And I don't see that as a basis for making a diverse credibility finding. Your Honor, I believe the ALJ provided several reasons, specific legitimate reasons for her credibility finding. Together, as this report found, maybe each one individually wouldn't be enough to support a discounting of Mr. LaBorne's symptoms testimony. But taken together, they are enough to uphold or to establish substantial evidence in support of that finding, including, I would argue that the testimony is not quite as clear as the public suggests that when Mr. LaBorne was asked. You have to look at the testimony in conjunction with the exhibits, which, by the way, I agree with Judge Trump. That's not what we should be having to do. We should be able to go through this and understand the exact places where her decision, especially the finding that his follies, aspects of his symptoms of treatment, didn't meet a listed impairment. Because I don't see the reasoning for that. And the results read it. I just read it. I go, wow. I shouldn't be doing this. I'm not an expert. I don't even understand what the medical terms are. I do know what an epidural is. And if somebody's going to stand me, obviously that's a problem. But I just can't put it together to follow her reasoning and find support for it. Well, Your Honor, I would suggest one of the clearest ways to understand why a 104A finding is not support is that the ALJ gave great weight to state agency physicians and significant weight to a consultant examiner, and some weight to another consultant examiner, and none of whom suggested that it was a poor and unsatisfying 104A. Can I ask, what step did she do to that? What step did she do to that? Sorry, Your Honor, I'm not sure. Right. As part of the RCSS, you're right, there's three. Hand cast, step three, and then you get into the other stuff. But that's too late in the game, isn't it? I would suggest that you look at the record as a whole, that it facts. See, that's the problem. That's the problem. You know, we're not supposed to be rooting around like pigs looking for truffles in this thing. It's one thing to say whether or not the decision is supported by substantial evidence. It's another thing to say, and we've got to spend, you know, two days, the way I did, reading through all of this stuff, trying to find out what's there and what's not there. The rule seems to require her to explain herself, and she did not. Your Honor, she could have provided a better explanation, but she did at least acknowledge and consider the listing, the ones, the series listing. And I believe the medical opinions alone show that there is substantial evidence that 104A is not legitimate. One other point I would like to turn to is Dr. Tran's opinion. It clarifies some of Dave Holland's comments earlier. I don't believe the record is true. He asserts that multi-specialty physicians say that that was Dr. Tran, but the record doesn't have Dr. Tran's name on it. In any place I can understand evidence that Dr. Tran treated Ms. LeVoir until maybe 2010. Wait a minute, wait a minute, time out, time out. What's scanned mean? I believe there, at some point in the record, maybe 2010, there's indication on the pain center, medical records indicating that Dr. Tran was a requesting physician, but there's also a period of time in 2008, 2009, 2010, where a different doctor is listed as Ms. LeVoir's primary care physician, not Dr. Tran. And as far as I can tell, the first actual record showing Dr. Tran treating Ms. LeVoir is January 2012, where he asks Dr. Tran to fill out the disability paperwork, and then again in February 2012 when he does, in fact, offer his opinion. And, again, Mr. Herschel. Somebody said it clarified that, too, instead of causing us to try to guess and infer. The reporter would say that's his burden and he didn't carry it. Yes, Your Honor. And Dr. Tran did not help himself. One of the considerations and the amount of weight you give to a treating source physician is how well it's supported and consistent with the rest of the record. And he doesn't, on his two-page checklist opinion, indicate the length of time he's been treating Ms. LeVoir. And that's something the LJ didn't expressly take into consideration, but it certainly doesn't provide support for giving control or even being deferential to the opinion of Dr. Tran. Your Honor, your counsel's judgment will affect an interjected question in terms of the procedures for this agency. Could we tell the LJ to take more testimony from Dr. Tran specifically, or are we limited to just making an up-or-down decision on whether the LJ's reasoning was adequate? Your Honor, I don't believe you're limited to an up-or-down decision, but I think if the court would decide that additional testimony was needed from Dr. Tran, the court or the ALJ would be positioned to have to reconsider all the evidence in light of Dr. Tran's opinion and that testimony, because the record is unclear and his opinion is not much help in determining the extent to which he's treating a relationship with Mr. LeVoir. The only basis for his opinion finding extreme limitations in Mr. LeVoir is the back pain and leg pain, and it doesn't appear from the record that Dr. Tran treated Mr. LeVoir for those impairments. That was Dr. Turley at the pain center who, in fact, provided medication and treatment for the back and leg impairments. Dr. Tran provides no other basis for his opinion, and he appears to have primarily provided regular treatment care for asthma and allergies for rash I believe. Was there a vocational expert involved in this? Yes, Your Honor. In what opinion did he apply some jobs made by the ALJ? With the RFC assessed by the ALJ, there was only one job. It was the job of cashiers.  Can you count this in standups? Earlier when I was talking about what Mr. LeVoir may have said, the excerpt of record, FDR 96, says LeVoir doesn't like the idea of working in an office, unquote, and that, quote, claimed it himself that he could do a office-type job but does not want to work in an office. That's FDR 99. Does that have any bearing on this? Your Honor, I don't believe the ALJ expressly mentioned those findings. It's not a basis or rationale for her statement. I think it does sort of support her seeking evaluation where she mentions the worker's mom and the fact that he was out looking for work at some point, which I suggested that he himself did not do. That's part of the problem of having to root around in this record for hours after hours after hours of the AJ and the ALJ, which is to confront these things, as the ALJ is required to do, would be a lot easier. Your Honor, I do believe the ALJ could have been a little clearer and provided a little more detailed analysis, but I think students who like the decision provide substantial evidence for the decision made, including the reliance on the five opinions on one side, suggesting that it's the score and some importance of reduced labor and capacity with the sit-stand option versus the opinion of Dr. Chang. Did she say that in her decision, I'm relying on the five opinions? Not necessarily, but she did walk through five. Certainly not at all. I would respectfully disagree, Your Honor. I believe she does discuss the five different medical opinions and explain the way to get into those opinions. And I thought she said that Dr. Chang's position was an outlier compared to the other ones. That is correct. And that's after having discussed the prior five decisions, all suggestive that Ms. Villabor was capable of a reduced range of legwork, whereas Dr. Chang's opinion was less than sedentary. Counsel, let me ask you a question. About one part of your argument, you've mentioned the fact that he applied for a workers' compound, and that maybe shows his ready, willing, and able, whereas the testing is ready, willing, and able to do for him. But would one be able to do exactly what Ms. Villabor did for Dr. Chang? Your Honor, I'm actually not sure as to the requirements of the workers' comp, or do you think he needs to look for work to support that? Again, I would suggest that it's just one of several pieces of information the ALJ considered as part of her symptoms evaluation, and more specifically maybe was the effectiveness of the pain medication versus support testimony as to the effectiveness of that medication. Thank you. Your Honor, as I'm looking at the 1.04 elements, I do want to note that there is evidence of the improved compression. We've gone through all of them. With respect to the straight leg raising, I do note that a lot of times the treating physician indicated that it was negative, but that the commissioners thought, hold on, hold on, hold on, hold on, hold on. Dr. Tran, the treating physician, indicated it was negative. I believe they were in the pain management records, but I did check some of the citations that the commissioner offered, and I do want to be clear. They indicated that they were negative. I don't think that stops us from finding meaning or an equaling of listing 1.04. I want to explain to you why that is. One, I'm not sure that each and every aspect of that listing needs to be met. There may be an or in there. I could not pull it out during the oral argument, but more importantly, let's look at the obesity policy ruling. It's not an or. It's not an or. I couldn't pull it up during it. But let's look at the obesity policy ruling. And in there, it specifically states that individuals with morbid obesity can be more equal listing 1.04 despite missing one of the elements. And they define extreme obesity as 40. He's at 50. He's over 350 pounds at 5 feet 8 inches. Are you paraphrasing or reading from the obesity listing? I don't have that in front of me, so I would have to say I'm paraphrasing. But I am saying confident in what I'm representing to the court. What's the number of the obesity listing? 1.04? No, I believe it's 02-90. I can check my notes. I believe that's what you said. It's inside and in my brief here. What I really wanted to also point out was the commissioner says we're supposed to look and support a development of the record, and I agree with that. Dr. Cunningham didn't review any records. Dr. Frumman didn't review any records. Because, as I always forget, the non-examining physician didn't review many records. I think he commented on three. One of which was cardiac impairment. And the other doctor simply says, I agree. He doesn't even say anything. None of those doctors looked at the board of development of the record. And I know there's an issue as to whether Dr. Turley was treating him, that Dr. Tran was treating him for how long. But if you look at those records, they're indicating Dr. Apple was the surgeon. He treated that patient. Did you talk to Dr. Tran? No. I have not had any personal conversation with Dr. Tran. Never? Never. If it would be unusual to do that, we usually do everything by written correspondence. We send them, you know, forms. You're asking us to infer from the records that his treatment extends backwards beyond three years. Well, the commissioner agrees that treatment started in 2010. And actually, when I'm looking at the record, it does look like Dr. Apple was the treating physician. He's the one who did the surgery through 2010. And then it looks like it was handed over to Dr. Tran. They are in the same facility. And if you look at Dr. Tran's records from 2010 forward, that's where he's having the injections, the epidurals, the facets, the nerve ablation. He's getting all the pain medications. He's communicating with the pain management. When we look at the definition of a treating physician under 20 CFR, Section 404, 1527, they talk about a treating relationship. Case law tells us that the doctor sees an individual only two times in a 14-month period. That's good enough. Clearly, Dr. Tran has a lot more familiarity with Mr. LeBaron than what our case law requires and what the statute requires. And the policy rulings indicate that his opinion is entitled to greater weight, provided it's consistent with the longitudinal records, which here it is. And if we look at the case of Warren and Lester, it talks about how we compare these opinions to other opinions. In fact, Mr. LeBaron was asked to question Social Security's doctors at hearings and ask the discipline of the issue to find out why their assessments of what Mr. LeBaron could or could not do differentiates from those actual treatment notes, differentiates from the treating physician opinion. And she just said it was not necessary. Counsel, Judge Gould, if I might interject, I think I have the same question for you that I was going to ask the government. Is it open to us to say that the ALJ should deal us in more information from Dr. Tran as part of the remand, or do we just have to make an up or down? So here it's not an adequate decision on the quality of her reasoning. Without knowing for sure the answer to that question, Your Honor, I would suspect that the court would have authority to remand for further proceedings and recommend it. I don't know if Dr. Tran is still in practice, where he is, anything like that. But I'm sure it could be a recommendation. If the court were going to entertain that, I would also ask the court to introduce a direction, which the court can do, of having the commissioners' doctors testify so that I could question them. Because the court has discretion. Because under the Social Security Act, there's a right to request the opinion of the examining physicians or the non-examining physicians. And this is the Supreme Court's case on point. Perales against Richardson, I can't give you the citation off the top of my head, and it's likely not on my computer over there. I would ask that the court not do that. I think based upon the objective findings and the policy holding itself, we can find that the claimant meets Listing 1.04A and 12 documented remand for accommodation of benefits, or based on Smallman and Lindenfelter. Credit is true. Mr. Lavorin's complaint, there was a vocational expert who testified. If we believe these complaints of pain, he can't sustain any work. And I would like to address, and probably out of time, I'm going to say this and a lot of questions at the end. In terms of your honest questions regarding the statement that Mr. Lavorin said he could do office work, that's not in the reports from Mr. Lavorin. I don't know if that statement's anywhere in the record or not. But the vocational expert says he can't. The vocational expert says based upon these restrictions and limitations, the only job he could do is cashier. And that's not an office job. So I would say that there would be no need to remand on that issue as well, Your Honor. All right. Thank you very much, counsel. Lavorin v. Duriell. It's submitted. We're going to take some minutes and challenge mechanics v. Jacobs. We're going to take Arias v.
judges: Trott, Wardlaw, Gould